United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MICHAEL TODD PANELLA,                     No. C 06-00795 CRB (PR)

12              Petitioner,                    **MEMORANDUM AND ORDER
                                               DENYING PETITION FOR HABEAS
13      v.                                     CORPUS**

14   JOHN MARSHALL, Warden,

15              Respondent.
                                        /
16

17          Michael Todd Panella is a state prisoner who filed a petition for a writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted of first degree murder in

19   connection with the death of a twenty-month-old child.  Panella asserts that his constitutional

20   rights were violated through the prosecution's improper use of the testimony of jailhouse

21   informants and through numerous instances of jury misconduct.  Panella's petition is hereby

22   DENIED.

23

24   I.     Background

25          The pertinent facts in this case are taken from those set forth by the California Court

26   of Appeal.  The state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).

27   Panella began dating Tammy Bell in July 1999.  Tammy had two sons: Alex, who was

28   approximately five-years old, and Jonathan, who was twenty-months.  Tammy and her sons

     started staying at Panella's home on a regular basis around the beginning of November 1999.

**United States District Court**
For the Northern District of California

1    Around the time Tammy began dating Panella, Tammy and others began to notice that

2    Jonathan had a lot of bruises. When asked, Tammy replied that she was unaware where the

3    bruises came from. When Tammy asked Panella about the bruising, he said Jonathan fell or

4    Alex caused them. Tammy and Panella fought because Panella thought Tammy did not

5    discipline Alex properly.

6    In mid-November, Tammy, Panella, and her children visited a friend to take the friend

7    some groceries. Tammy went into the home with Jonathan, while Panella and Alex remained

8    in Panella's truck. Blanca Cruz was in the area outside of the home and heard Alex whining.

9    Cruz saw Panella's hand move and heard a bang on the truck window, which broke. Alex

10   began to cry. Panella went into the house and told Tammy that Alex had broken the window,

11   but Alex told Tammy that Panella shoved his head into the window. At the time, Cruz did

12   not want to get involved with the incident, but when pressed, she agreed with Panella that

13   Alex broke the window.

14   At the end of November, Jonathan appeared to be sick. On Thanksgiving evening,

15   Tammy decided to take Jonathan to the doctor. Panella refused to let Tammy use his truck,

16   and told Tammy that the authorities would take Jonathan away if she visited the doctor.

17   Tammy called her sister, Melissa Maldonado, who drove Tammy and Jonathan to the Kern

18   Medical Center. Maldonado stated that she could see bruises on Jonathan's face and neck.

19   After waiting for over three hours, Tammy and Jonathan left the hospital before being seen

20   by a doctor. When asked by others, Tammy lied and said Jonathan had seen the doctor and

21   was asked to return on Monday. Tammy asserts that she lied because she did not want others

22   to think she was a bad mother.

23   On Saturday, November 27, Tammy packed her belongings and planned to move out

24   of Panella's house the following day. That afternoon, Tammy left Jonathan with Panella

25   while she went to find some methamphetamine. Panella had asked Tammy to leave Jonathan

26   with him because he did not want to be alone. Tammy returned home shortly before 7 p.m.

27   She looked into the bedroom and saw Jonathan lying on the bed, apparently sleeping.

28   Tammy left again and returned home at approximately 10 p.m. Jonathan was still in bed.

1    At around midnight, Tammy went into Jonathan's bedroom and got into bed with him.

2  When she reached for him, she realized he was cold and hard.  She began screaming and

3  called 911.  Law enforcement officers and paramedics soon arrived and declared Jonathan

4  dead.  Tammy was crying uncontrollably and would not put Jonathan down.  Panella showed

5  little emotion.  At the time, Jonathan had at least fifty bruises to his abdomen, hips, head,

6  face, and extremities, as well as extreme trauma to the small bowel.  He died as a result of

7  multiple blunt impacts to his abdomen, which caused dehydration and internal hemorrhaging.

8  Jonathan died sometime between 8 p.m. and 10 p.m., the fatal injuries occurring within one

9  to three hours prior to death.

10    Sometime later, Blanca Cruz told Tammy's mother that, on the day the window was

11  broken in Panella's truck, she saw him confront Alex before she heard the bang of the

12  window.  When Tammy found out, she searched for Cruz, beat her up, forced her into a car

13  and took her to the police station to report what she had seen.  Cruz admitted that she was

14  threatened by Tammy and her mother.

15    Panella was ultimately charged with Jonathan's murder.  Panella's defense was that

16  Tammy was in fact responsible for her child's death.

17    A.    The Prosecution's Case

18    At trial, the prosecution set forth evidence to support the foregoing chronology of

19  events.  The prosecution also called friends, neighbors, and relatives who testified that

20  Tammy was a good mother and did not mistreat her children.

21    The prosecution further sought to admit evidence, through the testimony of Blanca

22  Cruz, describing the incident when Panella allegedly shoved Alex's head into the truck

23  window.  Cruz was incarcerated at the time of the trial and was transported to court in a

24  police van.  Panella and Cruz rode in the same van to the courthouse.  Panella allegedly told

25  Cruz he knew who she was and that she was testifying against him.  Panella threatened that

26  Cruz better change her testimony or she would "be taken care of."  Panella told Cruz that he

27  knew her housing locations in the jail, knew about incidents that had happened in jail, and

28

**United States District Court**
For the Northern District of California

1   knew her release date.  This frightened Cruz, and she changed seats on the van to move

2   farther away from Panella.

3        Three other inmates recounted the incident on the van between Cruz and Panella,

4   corroborating Cruz's account.  Glenna Gates, Pamela Hawkes, and Bradley Borison all

5   testified that they heard Panella threaten Cruz.  In addition, Hawkes testified that Panella

6   said, "I killed the little bastard."  Borison testified that after the in limine hearing was over,

7   Panella was pleased that Cruz was not a good witness.  Panella allegedly commented that he

8   was going to get away with murder, just like O.J. Simpson.  At trial, Hawkes and Borison

9   both testified that they did not expect to receive anything in return for their participation in

10  the prosecution's case – a representation that is now contested by Petitioner.

11       Colleen Sullivan, the mother of Panella's two biological children, also testified.  After

12  Sullivan separated from Panella she moved with the children to Las Vegas.  Sullivan testified

13  that Panella went to Las Vegas and asked Sullivan to return with him.  When Sullivan

14  brought the children out of the house to see Panella, he picked them up and headed towards

15  his car.  Sullivan grabbed their legs and pulled on them, but Panella continued to push the

16  children into the car.  Sullivan's father came out and helped get the children away from

17  Panella.  The police were called, but Panella left before they arrived.

18       B.    The Defense

19       In defense, counsel called pathologist Barry Silverman, who testified that Jonathan

20  died between 8:30 and 10:30 p.m., and the blows that caused his death occurred one to three

21  hours before death; thus, Tammy was home during part of the time that the blows may have

22  been administered.  Silverman also testified that Jonathan had injuries that arose four to eight

23  weeks prior, which was before the time that Tammy lived with Panella (but after they began

24  dating).

25       Other witnesses for the defense testified that Panella was good with his children,

26  while Tammy would occasionally strike her children and tell them to shut up.  The defense

27  also called a witness from the police van who testified that she did not hear Panella threaten

28  Cruz, and other witnesses were called to impeach the van occupants' testimony.  Borison,

United States District Court
For the Northern District of California

4

**United States District Court**
For the Northern District of California

1   Gates, and Hawkes all had lengthy criminal histories.  In addition, Gates, Cruz, and Hawkes

2   had all been put in the same holding tank after arriving at court from the jail, and the defense

3   presented evidence suggesting that Cruz encouraged the other women to testify that Panella

4   had threatened her in the van.

5           C.      Procedural History

6           On October 19, 2000, a jury found Panella guilty of first degree murder by torture and

7   assault of a child under eight.  The trial court sentenced Panella to twenty-five years to life.

8   Panella filed a direct appeal from the judgment of conviction, and the California Court of

9   Appeal for the Fifth Appellate District affirmed the conviction on December 27, 2002.  The

10  California Supreme Court denied his petition for review on March 19, 2003.

11          Panella then filed two pro se state post-conviction collateral challenges.  His first

12  petition for a writ of habeas corpus was filed in Kern County Superior Court, and was denied

13  on December 17, 2004.  The second petition was filed directly with the California Supreme

14  Court, and was denied on June 21, 2006.  The instant federal habeas petition was filed on

15  June 22, 2006.  Respondent moved for dismissal on the ground that it is barred by the statute

16  of limitations.  In February 2008, the Honorable Oliver W. Wanger denied Respondent's

17  motion, finding the petition was timely filed.  Judge Wanger ordered Respondent to submit a

18  response addressing the merits of Panella's petition.  On November 24, 2008, this matter was

19  reassigned to visiting District Court Judge Charles R. Breyer.

20

21  II.     Standard of Review

22          A federal court may entertain a petition for a writ of habeas corpus under the

23  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "in behalf of a person in

24  custody pursuant to the judgment of a State court order only on the ground that he is in

25  custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

26  2254(a).  A federal writ of habeas corpus may not be granted with respect to any claim that

27  was adjudicated on the merits in state court unless the state court's adjudication of the claim:

28  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

1 clearly established Federal law, as determined by the Supreme Court of the United States; or

2 (2) resulted in a decision that was based on an unreasonable determination of the facts in

3 light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The

4 state court decision to which § 2254(d) applies is the "last reasoned decision" of the state

5 court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d

6 1085, 1091-92 (9th Cir. 2005).

7        Under the "contrary to" clause, a federal habeas court must only consider as clearly

8 established federal law "the holdings . . . of the Supreme Court as of the time of the state

9 court decision."  Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003) (citing Williams v.

10 Taylor, 529 U.S. 362, 412 (2000)).  "While circuit law may be 'persuasive authority' for

11 purposes of determining whether a state court decision is an unreasonable application of

12 Supreme Court law, only the Supreme Court's holdings are binding on the state courts and

13 only those holdings need be reasonably applied."  Id.  Under the "unreasonable application"

14 clause, a federal habeas court "may not issue the writ simply because that court concludes in

15 its independent judgment that the relevant state-court decision applied clearly established

16 federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

17 Williams, 529 U.S. at 411.

18        While habeas corpus relief is an important instrument to assure that individuals are

19 constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887 (1983), direct review of a

20 criminal conviction is the primary method for a petitioner to challenge that conviction,

21 Brecht v. Abrahamson, 507 U.S. 619, 633 (1993).  The state court's factual determinations

22 must be presumed correct, and the federal court must accept all factual findings made by the

23 state court unless the petitioner can rebut the presumption by clear and convincing evidence.

24 28 U.S.C. § 2254(e)(1).

25 ///

26 ///

27 ///

28 ///

6

1   III.     <u>Discussion</u>

2        Panella asserts four grounds as the basis for relief.  Three of Petitioner's arguments

3 are centered around the propriety of the prosecution's use of the jailhouse informants'

4 testimony.  The fourth ground raises numerous instances of juror misconduct.

5        A.     <u>Prosecution's Use of Testimony of Jailhouse Witnesses</u>

6        Panella raises three claims concerning the testimony of Bradley Borison and Pamela

7 Hawkes.  First, Panella argues that the prosecution violated his due process rights by failing

8 to disclose that both witnesses had allegedly been implicitly promised leniency in return for

9 their testimony.  Second, he claims that the prosecution failed to disclose background

10 information on Borison and that the district attorney's office and the probation department

11 regarded him as a liar.  Finally, Panella claims that the prosecution knowingly allowed

12 Borison and Hawkes to testify falsely that they were not expecting leniency in return for their

13 testimony.

14        Prosecutorial misconduct is cognizable in federal habeas corpus.  A defendant's due

15 process rights are violated when a prosecutor's misconduct renders a trial fundamentally

16 unfair.  <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986); <u>Smith v. Phillips</u>, 455 U.S. 209,

17 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial

18 misconduct is the fairness of the trial, not the culpability of the prosecutor").  A prosecutor

19 has an affirmative duty to disclose evidence favorable to the accused.  <u>Brady v. Maryland,</u>

20 373 U.S. 83, 87 (1963).  "[S]uppression by the prosecution of evidence favorable to an

21 accused upon request violates due process where the evidence is material either to guilt or

22 punishment, irrespective of the good faith or bad faith of the prosecution."  <u>Id.</u>  A

23 prosecutorial misconduct claim is decided on the merits, examining the entire proceedings to

24 determine whether the prosecutor's conduct "so infected the trial with unfairness as to make

25 the resulting conviction a denial of due process."  <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th

26 Cir. 1995).

27        In habeas claims alleging a violation of a prosecutor's duty not to present or to fail to

28 correct false evidence, the petitioner must show that (1) the testimony was actually false, (2)

<div style="text-align:left; font-weight:bold; writing-mode:vertical-rl;">United States District Court</div>
For the Northern District of California

7

the prosecution knew or should have known that the testimony was actually false, and (3)
that the false testimony was material.  United States v. Zuno-Arce, 339 F.3d 886, 889 (9th
Cir. 2003).  "Material" means that there is a reasonable likelihood that the false evidence or
testimony could have affected the judgment of the jury.  United States v. Agurs, 427 U.S. 97,
103 (1976); Morris v. Ylst, 447 F.3d 735, 743 (9th Cir. 2006).  Under this standard, "the
question is not whether the defendant would more likely than not have received a different
verdict with the evidence, but whether in its absence he received a fair trial, understood as a
trial resulting in a verdict worthy of confidence."  Hayes v. Brown, 399 F.3d 972, 984 (9th
Cir. 2005) (internal quotation marks and citation omitted).

Petitioner raised the prosecutorial misconduct argument in his habeas application to
the Kern County Superior Court.  To support his claim that there was an implicit deal
between prosecutors and the jailhouse witnesses, Petitioner cites to a prosecutor's testimony
at Borison's sentencing hearing, stating that his testimony was "important" to her
"circumstantial" case.  The prosecutor also failed to object when Borison's attorney argued
that without his testimony, Panella would have been acquitted.  Petitioner further makes
numerous allegations regarding widespread improprieties in the Kern County District
Attorney's office, and provides general information on the unreliability of the testimony of
jailhouse informants.

The state superior court rejected Petitioner's position, finding that he failed to
demonstrate that any prosecutorial misconduct occurred.  The court held that there was no
evidence to indicate that the prosecution did anything to suggest that Borison or Hawkes
would be rewarded for their testimony, or that either witness expected any such treatment.
As for evidence that law enforcement considered Borison to be a liar, the superior court
found that (1) the prosecution had provided ample information that they held such an
opinion; (2) Panella had not shown that the prosecution failed to present any additional
information in this regard; and (3) that any such additional evidence would not have been
material.  The superior court further rejected Panella's claim that the prosecution knowingly

**United States District Court**
For the Northern District of California

1  elicited false testimony, finding there was nothing to suggest that either witness had in fact

2  lied or that the prosecution knew they had lied.

3         Petitioner has not submitted sufficient evidence that would suggest the prosecution

4  offered any false testimony.  The evidence Petitioner points to in support of his claim of

5  prosecutorial misconduct is threadbare.  During Petitioner's trial, the attorneys for both

6  Hawkes and Borison appeared in court and asserted that their clients had not agreed to any

7  deal with the prosecutors.  Petitioner points to the testimony of the prosecutor at Borison's

8  sentencing, but that testimony only confirmed that the case against Panella was

9  circumstantial.  The prosecutor refused to say that Borison's testimony was critical to her

10  case, and was adamant in maintaining that no benefit was conferred upon Borison in

11  exchange for his testimony.  Simply because a prosecutor testified at the sentencing of one of

12  the informants does not prove that there was a secret deal withheld from Petitioner.  In later

13  proceedings, Borison and Hawkes emphasized their participation in Panella's prosecution as

14  a means of earning favorable treatment, but that does not demonstrate that there was any deal

15  struck between the witnesses and prosecution.  A finding of prosecutorial misconduct cannot

16  automatically stem from a witness's request to receive lenient treatment based on his

17  cooperation.  Petitioner's broad allegations of misconduct in the Kern County District

18  Attorney's office and generalized recitation of problems with jailhouse informants are

19  similarly unavailing.  Petitioner has failed to demonstrate that the state court committed error

20  in finding that Petitioner's allegations of misconduct were insufficient.

21         Petitioner complains that the state court erred in failing to hold an evidentiary hearing

22  to determine whether there was a secret deal.  Petitioner urges this Court to hold an

23  evidentiary hearing on the issue of prosecutorial misconduct.  In determining whether

24  Petitioner is entitled to evidentiary hearing, the Court first looks to see if Petitioner diligently

25  developed the factual record in state court.  Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir.

26  2005).  Here, the diligence requirement is met, as Petitioner submitted fifty exhibits and 1600

27  pages of documents to support its claim.  A party who has diligently developed the record is

28  entitled to an evidentiary hearing if he can show that:

9

1

(1) the merits of the factual dispute were not resolved in the state hearing;

2

(2) the state factual determination is not fairly supported by the record as a whole;

3

(3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;

4

(4) there is a substantial allegation of newly discovered evidence;

(5) the material facts were not adequately developed at the state-court hearing; or

5

(6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

6

Townsend v. Sain, 372 U.S. 293, 313 (1963).

7

8

If the petitioner can establish any one of these circumstances, then the state court's

9

decision is based on an unreasonable determination of the facts and the federal court can

10

independently review the merits of the decision by conducting an evidentiary hearing. Earp,

11

431 F.3d at 1167. An evidentiary hearing is required if (1) a petitioner has alleged facts that,

12

if proven, would entitle him to habeas relief, and (2) a petitioner did not receive a full and

fair opportunity to develop those facts. Id.

13

Here, an evidentiary hearing is unnecessary because even if Petitioner could prove

14

there was an implicit deal between the prosecution and the jailhouse witnesses, it would not

15

entitle him to habeas relief. The prosecution has an affirmative duty to turn over to the

16

defense all evidence favorable to the accused. See Kyles v. Whitley, 514 U.S. 419, 432

17

(1995); Giglio v. United States, 405 U.S. 150, 154 (1972). The failure to disclose favorable

18

evidence violates due process when the evidence is material. United States v. Bagley, 473

19

U.S. 667, 678 (1985). Evidence is material if there is a reasonable probability that, had it

20

been disclosed to the defense, the outcome of the trial would have been different. Id. at 682.

21

A reasonable probability occurs when the suppression "undermines confidence in the

22

outcome of the trial." Kyles, 514 U.S. at 434 (internal quotation marks omitted).

23

A prosecutor also has an independent, constitutional duty to correct testimony he

24

knows to be false. Napue v. Illinois, 360 U.S. 264, 269-70 (1959). If the prosecutor fails in

25

that duty, a conviction may be set aside only where there is a "reasonable likelihood that the

26

false testimony could have affected the judgment of the jury." United States v. Agurs, 427

27

U.S. 97, 103 (1976).

28

United States District Court

For the Northern District of California

10

1    Here, Petitioner fails to show that the evidence that was purportedly hidden by the

2  prosecution was material.  The Court finds that there is no reasonable likelihood that the

3  result may have been different if the jury either heard nothing from Hawkes and Borison, or

4  if they testified that they did expect lenience from the prosecution in their own cases through

5  their cooperation.  Their testimony was offered to corroborate Blanca Cruz's testimony

6  regarding the threats made by Petitioner in the sheriff's van.  Cruz's testimony was also

7  corroborated by a third inmate, Glenna Gates.  Moreover, both Borison and Hawkes were

8  thoroughly cross-examined.  The defense aggressively questioned the witnesses and

9  impeached their credibility, using, among other things, their past convictions.

10    Independent evidence demonstrated that Jonathan's injuries began to appear at the

11  time Petitioner became involved with Tammy Bell, Petitioner was with Jonathan for the

12  entire day of the murder, and that Petitioner was with Jonathan during the period when the

13  fatal injuries could have been inflicted.  The prosecution also presented evidence of

14  Petitioner's other violent acts against young children.  The defense tried to shift culpability to

15  Tammy herself, but the jury was ultimately unpersuaded.  Even if Petitioner was able to

16  show through an evidentiary hearing that the prosecution had a secret deal with Hawkes and

17  Borison, he has not established that disclosure of such information would reasonably have

18  affected the fairness of the trial.

19    In finding that Petitioner is not entitled to an evidentiary hearing, the Court notes that

20  this case differs in significant ways from Earp v. Ornoski, 431 F.3d 1158 (9th Cir. 2005).

21  Both are similar in that they dealt largely with circumstantial evidence in a credibility battle

22  between the defendant and another individual.  See id. at 1167.  In Earp, the other suspect

23  appeared as a key witness for the prosecution.  Id.  After the trial was over, the defense

24  investigator located a potential jailhouse witness, Taylor, who might have impeached the key

25  witness's testimony.  Id. at 1168.  At the time of trial, Taylor was an inmate at the jail where

26  both the petitioner and the key witness were being held.  Id.  Taylor gave the defense

27  investigator information that would impeach the key witnesses's testimony and serve to

28  exculpate the petitioner.  Id.  Taylor alleged that he was subsequently visited by the

**United States District Court**
For the Northern District of California

1   prosecutor and a sheriff's deputy.  Id.  They took Taylor to a private room, "verbally abused

2   him, and told him that he would never get out if he stood by his statement."  Id.  Taylor

3   "capitulated in the face of the prosecutor's threats and retracted the statement."  Id.

4          In filing a habeas petition, Earp alleged this egregious behavior constituted

5   prosecutorial misconduct that violated his due process rights.  Id.  He supported his petition

6   with, among other things, declarations from Taylor and the defense investigator.  Id. at 1168-

7   69.  The state court denied the prosecutorial misconduct claim without conducting a hearing.

8   Id. at 1169.  The Ninth Circuit found this was in error, as the petitioner did not have a full

9   and fair opportunity to develop the facts of his claim and he presented a "colorable claim" for

10   relief.  Id.

11          The prosecutorial misconduct alleged in Earp is far more serious than what is alleged

12   here.  Impeachment evidence is likely to be material when it impugns the testimony of a

13   witness who is critical to the prosecution's case.  Silva v. Brown, 416 F.3d 980, 987 (9th Cir.

14   2005).  In Earp, the prosecution allegedly suppressed vital evidence that would have directly

15   contradicted the incriminating testimony of its key witness.  431 F.3d at 1168.  It is clear that

16   such misconduct, if proven, constituted a prejudicial violation of the defendant's due process

17   rights.  Given the gravity of the complaint, an evidentiary hearing was necessary so that the

18   petitioner had a full opportunity to flesh out his claim of misconduct.

19          Here, Petitioner's claim of misconduct bears a far more attenuated relationship to the

20   core of the evidence.  The impeachment evidence sought by Petitioner would not impugn a

21   witness who was "critical" to the prosecution's case.  See Silva, 416 F.3d at 987 (noting

22   impeachment especially likely to be material when it pertains to a "star witness" or a witness

23   "of the utmost significance").  The testimony that Petitioner thinks was missing did not, as in

24   Earp, directly contradict the other evidence presented against Petitioner.  Even if the jury

25   chose not to credit a word that the jailhouse witnesses said, there was still substantial

26   evidence to support the prosecution's case.  The Court is unpersuaded that with testimony

27   that the witnesses expected leniency in return for their cooperation, there is a reasonable

28   likelihood the jurors would have come to a contrary conclusion.  In fact, there was ample

1   evidence before the jury and the defense that the jailhouse witnesses had histories of

2   untruthfulness.  Accordingly, an evidentiary hearing on the issue of whether there was an

3   agreement between prosecutors and the jailhouse witnesses would ultimately be of no

4   consequence to Petitioner's claim for habeas relief.

5          Petitioner has also failed to demonstrate that the state court erred in concluding that

6   the prosecution failed to disclose information about the witnesses.  Petitioner's trial counsel

7   and the prosecution agreed that counsel would be able to question Borison about his rap

8   sheet, which it did.  The trial court told Petitioner that he could bring a motion for

9   continuance if he needed additional time to investigate Borison's credibility, but it does not

10  appear he ever asked for additional time.  There was ample evidence for the jury to assess

11  Borison's credibility and penchant for lying.  Even if documents about Borison's criminal

12  history were not disclosed to Petitioner, he has failed to show that such failure amounted to

13  <u>Brady</u> error.  Given the ample evidence of Borison's untruthfulness, there is not a reasonable

14  probability that there would have been a different result at trial if defense counsel had further

15  information about Borison's criminal history.  <u>See</u> <u>Sassounian v. Roe</u>, 230 F.3d 1097, 1108

16  (9th Cir. 2000).

17         In sum, the Court is not persuaded that when considering the claim of prosecutorial

18  misconduct, the state court either misapplied clearly established law or based its decision on

19  an unreasonable determination of the facts.  Petitioner is not entitled to an evidentiary

20  hearing to develop his theory because even if he could prove there was a secret deal between

21  prosecutors and the witnesses, such an agreement would not entitle him to habeas relief.

22  Accordingly, Petitioner's request for habeas relief based on the use of jailhouse witnesses is

23  denied.

24         B.      Juror Misconduct

25         A defendant accused of a crime has a constitutional right to a trial by unbiased,

26  impartial jurors. U.S. Const. amend. VI.  "Even if only one juror is unduly biased or

27  prejudiced, the defendant is denied his constitutional right to an impartial jury." <u>Tinsley v.</u>

28  <u>Borg</u>, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotation marks omitted).  However,

**United States District Court**
For the Northern District of California

1  the Constitution "does not require a new trial every time a juror has been placed in a

2  potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982).  The

3  safeguards of juror impartiality are not infallible; it is virtually impossible to shield jurors

4  from every contact or influence that might theoretically affect their vote.  Id.  Due process

5  requires a jury capable and willing to decide the case solely on the evidence before it and a

6  trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of

7  such occurrences when they happen.  Id.

8          Panella points to numerous alleged incidents of jury misconduct as a basis for relief.

9  In particular, Panella contends that:

10          (1) The jury violated the court's instructions by taking an immediate vote without

11  discussing the evidence and instructions;

12          (2) Several jurors commented upon the defendant's failure to testify;

13          (3) One juror concealed his knowledge of the Panella family;

14          (4) The same juror considered extraneous information when he talked about the habits

15  of methamphetamine users;

16          (5) One juror considered speculative reasons as to why Panella did not have custody

17  of his children;

18          (6) Jurors yelled at and intimidated another juror so as to compel her to change her

19  verdict.

20          On direct review, the state appellate court expended significant effort examining

21  Panella's claims of juror misconduct.  Panella's claims were based on the declarations of two

22  jurors.  The court set forth the factual background of each, analyzed each of Petitioner's

23  allegations in turn, and rejected all of his claims.

24                  1.      Alleged Misstatement During Voir Dire

25          The state court first addressed Panella's contention that a juror concealed information

26  on voir dire.  A petitioner may obtain a new trial because a juror failed to answer a voir dire

27  question correctly by showing: (1) that the juror failed to answer honestly a voir dire

28

United States District Court
For the Northern District of California

14

1  question, and (2) that this undermined the impartiality of the petitioner's jury.  Dyer v.

2  Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).

3         During voir dire, the trial court asked the jurors if anyone knew the defendant or

4  anyone on the witness list.  The witness list included two witnesses who had the same last

5  name as defendant: Matthew Panella and Patty Panella.  No jurors admitted knowing the

6  witnesses.  It later turned out that one juror said he knew of the "Panella family."  Panella

7  claimed the juror committed misconduct by concealing his knowledge of the "Panella

8  family."  The court rejected Petitioner's argument, finding that even if the juror knew

9  generally of the family, it did not mean that he knew the defendant or specific witnesses on

10  the witness list.  Accordingly, the state court found the juror answered the question truthfully

11  and had no reason to believe at the time of voir dire that his impartiality might be affected.

12  Thus, the state court held that Panella failed to show that the juror gave false answers on voir

13  dire or concealed a bias.

                    2.        Extrinsic Information in Deliberations

15         The state appeals court next looked at the interjection of information into deliberations

16  that was not presented at trial.  When information not admitted into evidence reaches the

17  jury, the defendant is entitled to a new trial if there existed a reasonable possibility that the

18  extrinsic material could have affected the verdict.  United States v. Langford, 802 F.2d 1176,

19  1180 (9th Cir. 1986).  A federal court reviewing a habeas claim of juror misconduct may

20  consider juror testimony concerning whether the improper evidence was considered by the

21  jurors, but may not consider the jurors' testimony about the subjective impact of the extrinsic

22  evidence.  Fields v. Brown, 503 F.3d 755, 778 (9th Cir 2007).  In determining whether a

23  defendant has suffered prejudice from extrinsic evidence, a court considers:

24         (1) whether the material was actually received, and if so, how;
           (2) the length of time it was available to the jury;
25         (3) the extent to which the juror discussed and considered it;
           (4) whether the material was introduced before a verdict was reached, and if so
26         at what point in the deliberations; and
           (5) any other matters which may bear on the issue of the reasonable possibility
27         of whether the extrinsic material affected the verdict.

28  Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008).

15

United States District Court
For the Northern District of California

1    The juror who claimed to know of the "Panella family" asserted that people who lived

2 in the same area were known for using drugs, and made comments about the habits of

3 methamphetamine users.  Another juror made statements about Panella's relationship with

4 his children in Las Vegas, which caused a different juror to infer as an implied presumption

5 that there had been violent confrontations with Panella's family in the past.  Panella argued

6 that the interjection of this extraneous information into jury deliberations was prejudicial

7 misconduct.

8    The state court first found that evidence of a juror's internal thought process regarding

9 how he interpreted another juror's statement was not itself evidence of misconduct.  The

10 court also held that statements made about the perception of Panella's relationship with his

11 children were simply a verbalization of a juror's mental processes.  Under California law, the

12 sharing of a juror's mental processes is not admissible evidence when a challenge has been

13 made to the validity of a verdict.  Finally, the court held that the information interjected into

14 deliberations regarding the use of drugs in the area where the Panella family lived and the

15 way that drug-users behave did constitute juror misconduct.  The court found, however, that

16 the comments were "not likely to have influenced a juror in his or decision nor did it

17 demonstrate bias on the part" of the juror who made the comments.  The key question in the

18 case was whether Panella or Tammy was responsible for the death.  There was evidence in

19 the record that both Panella and Tammy were drug users, which tempered whatever effect an

20 allegation of drug-using behavior would have on a juror's decision.

21                    3.        Petitioner's Failure to Testify & Immediate Vote

22    The next issue were a number of jurors' comments on Panella's failure to testify.  The

23 appeals court found that there was nothing in the affidavits presented to the trial court to

24 demonstrate that the failure to testify "was a subject of discussion or agreement by the entire

25 jury or to show that these were nothing more than transitory comments made during

26 deliberations."  The foreperson admonished the jurors that they were not to use Panella's

27 silence against him.  Ultimately, the court held there was "no substantial likelihood that the

28 defendant suffered actual harm" as a result of the jurors' comments.

16

United States District Court
For the Northern District of California

1    Panella argued that the foreperson's admonishment should not be given much weight

2  because the foreperson allowed an immediate vote on guilt or innocence to be taken as soon

3  as deliberations began, and he allegedly bullied another juror.  The court noted that it "was

4  not advisable" to take an immediate vote, but found the vote to be inconsequential because

5  deliberations did not end there.  Rather, the jury deliberated over the course of three days.

6  Again, the state court found that Petitioner failed to show a substantial likelihood that he

7  suffered actual harm from the jurors' discussion of his failure to testify.

8              4.      Juror Coercion

9    As for the badgering allegation, one juror's declaration stated that:

10   Throughout the deliberations I was subjected to harassment and verbal abuse
     by the other jurors.  Specifically, the inferences I derived from the evidence
11   were called "stupid."  I was yelled at and intimated by other jurors and
     repeatedly told I should vote guilty.  I was scolded for being "close-minded."  I
12   told them that I was considering the evidence objectively.  I was accused of
     voting "not guilty" because I had a bias against the district attorney's office.
13
     On the third day of deliberation, I told the Foreperson I had taken enough abuse
14   and to inform the judge that the jury could not reach a unanimous verdict.  I
     stated I wanted to leave the jury room, "now" and that I could no longer
15   tolerate being everyone's target.  Juror No. 12 agreed we could not reach
     unanimous agreement.  Upon telling the Foreperson I wanted to leave the room
16   and that he should inform the judge of the impasse, the Foreperson stood
     between the exit door and where I was seated.  I was intimidated and felt I was
17   not free to leave the room.  I began sobbing.  I could not understand why the
     Foreperson would not inform the judge that we could not reach a unanimous
18   verdict.  One of the jurors asked for a break.  After the break, I felt I could no
     longer endure any further mental abuse and that continued insistence that the
19   Foreperson advise the judge of the impasse was futile.  Regrettably, I decided
     to change my vote to "guilty".
20
     I believe the defendant is "not guilty" of the crimes charged.  I changed my
21   verdict only because of the Foreperson's refusal to declare a deadlocked jury
     and because of continuous badgering and harassment by the other jurors.  I felt
22   that if I continued to insist upon my opinion based on the evidence, that the
     defendant was not guilty, it would have been futile and would only subject me
23   to further abuse by other jurors.

24   At the time the judge polled the jury, I did not know it was appropriate to
     inform the court that the verdict of "guilty" I had rendered was not freely and
25   voluntarily rendered or that it was appropriate to inform the court of the
     behavior of the other jurors during the trial and during the deliberation process.
26
        Panella asserted that the coercive actions resulted in a violation of his constitutional
27
   right to a unanimous jury verdict.  The state court disagreed, noting that heated and even
28
   harsh discussion between jurors does not rise to the level of jury misconduct.  The court

**United States District Court**
For the Northern District of California

1   rejected the argument that the foreperson established "physical dominance" over the holdout

2   juror by standing before the juror and the exit door.  The juror failed to allege that she was

3   prevented from leaving the room, and during the subsequent break in deliberations she was

4   free to move about and reported nothing to the trial court.  Furthermore, before polling the

5   jury, the judge clearly explained the polling process.  This juror answered "yes" when

6   questioned separately for each count.  Accordingly, the court held there was no basis for a

7   new trial based on jury misconduct.

8              5.      Petitioner's Claims of Juror Misconduct Do Not Warrant Relief

9          A petitioner is entitled to habeas relief only if it can be established that the exposure to

10  extrinsic evidence had "'substantial and injurious effect or influence in determining the jury's

11  verdict.'"  Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting Brecht v.

12  Abrahamson, 507 U.S. 619, 623 (1993)).  The state court's determination that any juror

13  misconduct was not prejudicial is neither contrary to nor an unreasonable application of

14  Supreme Court precedent.  The state court also did not make an unreasonable determination

15  of the facts.  See 28 U.S.C. § 2254(d).

16         The state court reasonably concluded that there was no evidence that Juror No. 9 was

17  untruthful or concealed information in voir dire because he was never asked whether he

18  knew anyone in Petitioner's family.  See Dyer, 151 F.3d at 973.  His later statement that he

19  knew of the "Panella family" does not indicate that he recognized the names of Matthew or

20  Patti Panella from the witness list.  There is no support for the claim that the juror was lying

21  during voir dire.

22         The state court also acted reasonably in determining that Petitioner did not suffer

23  prejudice from the introduction of any extrinsic evidence.  See Langford, 802 F.2d at 1180.

24  Nothing in the evidence shows that a juror expressed knowledge of Petitioner or his family

25  members using methamphetamine.  An opinion that drugs are used in a neighborhood related

26  to the case is not so prejudicial as to warrant habeas relief.  Moreover, there was evidence of

27  drug use admitted at trial.  From that evidence jurors could have drawn their own conclusions

28  about the drug use of Petitioner or other witnesses.  The comment regarding Petitioner's

United States District Court
For the Northern District of California

1   limited contact with his children is also not grounds for reversal.  The comment was mere

2   speculation, and did not inject extrinsic evidence into deliberations.

3      It is improper for jurors to make remarks wondering what Petitioner had to "hide" by

4   his decision not to "get up there and testify."  However, the jury was admonished by the

5   foreperson that the defendant had a right not to testify.  Petitioner also did not suffer

6   prejudice on account of vote that was taken shortly after deliberations began, as the jury

7   deliberated over the course of three days.  The state court was reasonable in determining that

8   this alleged misconduct did not have "substantial and injurious effect or influence in

9   determining the jury's verdict."  Brecht, 507 U.S. at 637.

10      The Court also finds Petitioner's allegations of juror harassment insufficient for

11   habeas relief.  Of course, intimidation of jurors is certainly not to be condoned.  Yet again,

12   the state court carefully considered this claim and decided that Petitioner did not suffer

13   prejudice as a result of the jurors' conduct.  After the heated exchange between the jurors, the

14   jury took a break from deliberations and came to a unanimous decision.  When polled, the

15   allegedly intimidated juror confirmed that her verdict was "guilty."  The Court sees no reason

16   to disturb the state court's finding.  Moreover, Federal Rule of Evidence 606(b) "clearly bars

17   consideration of [a] declaration's allegation that [a] juror said that she was subjected to

18   pressure by other jurors for being a 'holdout for acquittal.'"  United States v. Decoud, 456

19   F.3d 996, 1019 n.11 (9th Cir. 2006).  Accordingly, the Court may not even be able to

20   consider the juror's declaration on the allegation of intimidation.

21      In sum, the Court finds the state court did not err in finding that the alleged jury

22   misconduct was not prejudicial.  Moreover, Petitioner fails to show how the state court's

23   determination of his claims conflicted with or misapplied controlling Supreme Court law.

24   See 28 U.S.C. § 2254(d).  Accordingly, his habeas application must be denied.

25      Petitioner complains that he is entitled to an evidentiary hearing on the allegations of

26   juror misconduct.  However, clearly established federal law, as determined by the Supreme

27   Court, does not require state or federal courts to hold a hearing every time a claim of juror

28   bias is raised.  Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003); see also 28 U.S.C.

1  § 2254(e).  In determining whether a hearing must be held, the court must consider the

2  content of the allegations, the seriousness of the alleged misconduct or bias, and the

3  credibility of the source.  <u>Palmateer</u>, 341 F.3d at 1044.  Here, the state court discharged its

4  duty of considering the content and seriousness of the allegations, and properly determined

5  that Petitioner was not exposed to unfair prejudice.  A further hearing on the matter is not

6  necessary.

7

8                                          Conclusion

9         Based on the foregoing, Petitioner's application for a writ of habeas corpus pursuant

10  to 28 U.S.C. § 2254 is hereby DENIED.

11       **IT IS SO ORDERED.**

12

13

14  Dated: August 10, 2009                    CHARLES  R. BREYER
                                              UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

G:\CRBALL\2006\0795\Panella Order.wpd                    20

*United States District Court*
*For the Northern District of California*